UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SANDY FRAGNITO, on behalf of L.F.,

                                    Plaintiff,

     - against -

BOARD OF EDUCATION OF THE SUFFERN
CENTRAL SCHOOL DISTRICT, f/k/a/ RAMAPO
CENTRAL SCHOOL DISTRICT,

                                    Defendant.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 19-CV-1598 (CS)

<u>Appearances</u>:

Sandy Fragnito
*Pro se Plaintiff*

Mark C. Rushfield
Shaw, Perelson, May & Lambert, LLC
Poughkeepsie, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

     Before the Court is the motion for summary judgment of Defendant Board of Education

of the Suffern Central School District ("Defendant" or the "District").  (Doc. 17.)[1]

## I.    **BACKGROUND**

     The following facts are based on Defendant's Local Civil Rule 56.1 Statement, (Doc. 18

("D's 56.1")), Plaintiff's Response and Counterstatement, (Doc. 24 ("P's 56.1 Resp.")), and

Defendant's Response, (Doc. 31 ("D's 56.1 Resp.")), and are undisputed unless otherwise noted.

---

[1] Defendant was formerly known as the Ramapo Central School District, so some of the
relevant documents in this case use that name.

A.    **Facts**

Plaintiff's son, L.F., attended the District's schools during the 2010-11, 2011-12, and 2012-13 school years.  (D's 56.1 ¶ 1; *see* P's 56.1 Resp. ¶ 1.)[2]  Defendant classified L.F. as "other health impaired," and for the 2012-13 school year, he was assigned to an "inclusion program with occupational therapy, counseling and a behavior consultation."  (D's Ex. 3 at 3; D's 56.1 ¶ 2.)[3]  Plaintiff, however, rejected the counseling recommendation.  (P's 56.1 Resp. ¶ 2.)  The parties dispute whether Plaintiff also rejected the occupational therapy and behavior consultation recommendations.  (*Id.*)

In December 2012, Plaintiff removed L.F. from the District's second grade and enrolled him in first grade at Our Lady of Mercy Academy ("Our Lady"), a "general education school with class sizes between 15-20 students."  (D's 56.1 ¶ 3 (internal quotation marks omitted).)  Prior to the 2015-16 school year, Plaintiff removed L.F. from Our Lady and placed him at "St. Paul's," another parochial school, with class sizes of approximately 18-20 students. (*Id.* ¶¶ 4-5.)  In April 2016, Plaintiff removed L.F. from St. Paul's after the principal there asked Plaintiff to do so due to "adverse behaviors in which [L.F.] had been engaging."  (*Id.* ¶ 7.)  When Plaintiff removed L.F. from St. Paul's, she informed Defendant that St. Paul's "was not benefitting him" and added that the class size there was too large for L.F.  (*Id.* ¶ 8.)

---

[2] Plaintiff responds to a number of Defendant's 56.1 Statements not by disputing the facts, but rather by making additional assertions that Plaintiff presumably believes provide needed context for Defendant's Statements.  Where the disputes are not actual disputes, the Court accepts Defendant's statements as true.

[3] The Court uses the exhibit designations used in the administrative record – "D's Ex. _" and "Parent's Ex. _" – unless referring to an exhibit that was not part of the administrative record but that Plaintiff submitted to this Court; those will be cited as "P's Decl. Ex. _."  Because Plaintiff is *pro se* and redaction of her exhibits would be burdensome, the Court has filed a hard copy of her Declaration under seal.  (Doc. 34.)

The District reevaluated L.F. in May and June 2016, and on June 7, 2016, the District's "CSE"[4] met with Plaintiff to review the results of the evaluation and discuss with Plaintiff L.F.'s individual education program ("IEP") for L.F.'s fifth grade year.  (*Id.* ¶ 9.)  Dr. Lisa Castaldo, who chaired the CSE and led the June 7 meeting, stated that L.F. had behavioral issues that needed to be addressed in a classroom environment, which Plaintiff admits, but Plaintiff argues that Dr. Castaldo had had no contact with L.F. since 2013, and thus she based her conclusions on test results that had not been "carefully prepared or checked for errors."  (*Id.* ¶ 10; *see* P's 56.1 Resp. ¶ 10.)  "Ms. Mitchell," a special education teacher, administered a "triennial psychological evaluation" of L.F., which determined that he had "overall average cognitive functioning," but elevated scores for "hyperactivity/impulsivity," "learning problems," and "defiance/aggression." (D's 56.1 ¶¶ 11, 14; P's 56.1 Resp. ¶ 14.)  Plaintiff disputes the accuracy of the test that found L.F.'s elevated scores in the latter categories.  (P's 56.1 Resp. ¶ 14.)  Mitchell stated, "L.F.'s behavior remains one of his biggest issues in learning."  (D's 56.1 ¶ 14 (internal quotation marks omitted); D's Ex. 5 at 2.)  Plaintiff notes that Mitchell was never L.F.'s teacher and performed only the aforementioned evaluation.  (P's 56.1 Resp. ¶ 14.)  Plaintiff also states that in creating L.F.'s IEP, the CSE failed to take into account that he may have been dyslexic.  (*Id.* ¶ 16.)  The record contains no evidence that L.F. has in fact been found to be dyslexic.

The CSE concluded that L.F.'s needs would be most appropriately met in a 12:1:1 Therapeutic Support Center ("TSC") class at "Montebello" for the 2016-17 academic year.  (D's 56.1 ¶ 16; *see* P's 56.1 Resp. ¶ 16.)  The TSC class had twelve students and two teachers, and a "class-wide behavior management system in place."  (D's 56.1 ¶¶ 18-19; *see* P's 56.1 Resp. ¶¶

_____

[4] This acronym refers to the District's "Committee on Special Education."  (*See* Tr. at 372-73.)  "Tr." refers to the transcript of the hearing before the New York State Education Department's Impartial Hearing Officer held on July 16 and July 25, 2018.

18-19.)  The CSE believed that a therapeutic class would be better than an integrated class for

L.F. because L.F. needed more support in the classroom, (*see* Tr. at 190-93, 236), and noted that

the TSC class also provided "'a lot of inclusion opportunities including in lunch and recess, but

also all of the elective specials' including art, music, and physical education, so that students

'mainstream with their age range peers,'" (State Review Officer (the "SRO") Decision at 16

(quoting Tr. at 73)).[5]  But there was no mention of these inclusion opportunities in the IEP

provided to Plaintiff.  (*See* D's Ex. 5 (2016-17 IEP); *see also* D's Ex. 6 (2017-18 IEP).)  Plaintiff

also notes that L.F.'s previous IEP had recommended that he be placed in an integrated class up

to and including the 2014-15 school year.  (P's 56.1 Resp. ¶ 20.)

The CSE noted that Plaintiff was "in agreement with the CSE[']s determinations," (D's

Ex. 5 at 2), but Plaintiff disputes that assertion, as she had expressed at least some concerns, (P's

56.1 Resp. ¶ 22; D's Ex. 5 at 2 (noting Plaintiff's disagreement about whether counseling would

assist L.F.).)  Plaintiff visited the Montebello school, but never visited the TSC class specifically.

(P's 56.1 Resp. ¶ 23; Tr. at 255.)

Instead of following the District's plan, Plaintiff unilaterally enrolled L.F. at Barnstable

Academy ("Barnstable"), a private school in New Jersey, for the 2016-17 academic year.  (*See*

D's 56.1 ¶¶ 23-24.)  Plaintiff did not provide written notice to the CSE that she would be placing

L.F. at Barnstable for that year.  (*Id.*; P's 56.1 Resp. ¶¶ 24, 40.)[6]

---

[5] The New York State Education Department sent to the Court the administrative record including the SRO Decision and the corresponding Impartial Hearing Officer (the "IHO") Decision, both of which are discussed below.

[6] Plaintiff partially disputes this fact, stating that she provided notice in 2013 that she was going to place L.F. in private school, and in that letter she reserved her right to "seek tuition reimbursement through an Impartial Hearing, for the cost of the private school placement."  (P's Decl. Ex. P; *see* P's 56.1 Resp. ¶¶ 24, 40.)  Because Plaintiff never put L.F. back into public school, she argues that the letter covers her decision to place L.F. at Barnstable.  The existence of

On March 23, 2017, Plaintiff sent a fax to the District, addressed to "Janet Feger," requesting that the District provide transportation for L.F. to Barnstable. (D's Ex. 15 at 2; *see* D's 56.1 ¶ 41.) Plaintiff included L.F.'s report card in the fax. (D's Ex. 15 at 3.) On the cover of the fax, Plaintiff stated, "Please let me know when we can schedule an IEP meeting to discuss [L.F.] attending Barnstable Academy next school year through district." (*Id.* at 1.)

On June 13, 2017, the CSE convened to review and develop L.F.'s IEP for the 2017-18 academic year. (P's 56.1 Resp. ¶¶ 17, 25.) Defendant states that the CSE did not have any information indicating that L.F.'s strengths and weaknesses had changed since the 2016 CSE meeting. (D's 56.1 ¶¶ 17, 26.)[7] The CSE again concluded that, based on all available information, L.F.'s needs would be appropriately met in the 12:1:1 TSC class. (*Id.* ¶ 27.) But Plaintiff argues that Defendant still failed to take into account whether L.F. was dyslexic, and that Defendant failed to send anyone to visit L.F. at Barnstable to determine whether it was an appropriate placement. (P's 56.1 Resp. ¶¶ 17, 27.)[8]

---

a 2013 letter explaining that Plaintiff was placing L.F. at Our Lady cannot form the basis of a dispute that Plaintiff failed to advise the CSE in writing that she was placing L.F. at Barnstable in 2016.

[7] Defendant states in paragraph 26 of its 56.1 Statement that "[a]s of June 13, 2017, the CSE had no information suggesting that L.F.'s needs had changed from what they had been as of the June 7, 2017 CSE meeting." (D's 56.1 ¶ 26 (citing Tr. at 77).) This appears to be a typographical error, as Defendant cites to a page on the transcript that says there had been no change between June 7, *2016*, and June 13, 2017, and in paragraph 17 of Defendant's 56.1 Statement, Defendant uses the June 2016 date. Accordingly, I am assuming Defendant meant to refer to the meeting held on June 7, 2016.

[8] Plaintiff also argues that Defendant failed to take into account a letter she sent to the District dated June 26, 2018, (P's Decl. Ex. M at 1), but that letter was sent a year after the 2017 CSE meeting, so I disregard any purported dispute that relies on it.

Plaintiff kept L.F. in Barnstable for the 2017-18 school year and did not advise the CSE that she intended to continue L.F.'s placement at Barnstable when the CSE convened to develop Plaintiff's IEP.  (P's 56.1 Resp. ¶ 29.)[9]

On September 28, 2017, Plaintiff filed a DPC Notice.  (SRO Decision at 3.)  In it Plaintiff challenged the "meeting information" section of the June 2017 IEP, said that having paid tuition for the past six years was causing hardship, and requested District placement for L.F. at Barnstable.  (D's Ex. 18 at 3.)[10]  Plaintiff's complaint was dismissed by an Impartial Hearing Officer, but Plaintiff appealed the decision, and a State Review Officer reversed it and allowed Plaintiff to file an Amended DPC to clarify her claims.  (Id.)

On April 12, 2018, Plaintiff provided the District with a "10 Day Notice of Intention to seek tuition reimbursement" for L.F.'s placement at Barnstable.  (D's Ex. 16.)  Before sending this notice, Plaintiff had at some point received a "Procedural Safeguards Notice" from the District advising her of the "10 business days" notice requirement for seeking tuition reimbursement from the District for a unilateral placement of L.F., but it is not entirely clear what years she received such notice.  (See P's 56.1 Resp. ¶ 43; see Tr. at 404; P's Decl. ¶ 36.)[11]

_____

[9] Plaintiff disputes this fact, stating that she advised the CSE of her disagreement with L.F.'s 2017 IEP when she filed a Due Process Complaint ("DPC") on September 28, 2017.  (P's 56.1 Resp. ¶ 29.)  But the DPC was sent months after the CSE convened to develop and issued Plaintiff's IEP.  So I disregard any purported dispute that relies on it.

[10] Plaintiff submitted a copy of her original DPC as Exhibit Q to her Declaration in this Court.

[11] Plaintiff in her 56.1 Response states that she did not receive the Procedural Safeguards Notice in 2017 when she received the 2017-18 IEP.  (P's 56.1 Resp. ¶ 43.)  Defendant objects, stating that during the hearing below, Plaintiff admitted to receiving the Notice, and Defendant cites to the hearing transcript and IHO's decision to support that fact.  (D's 56.1 Resp. ¶ 43 (citing Tr. at 148-49; IHO Decision at 12).)  But the documents to which Defendant cites do not establish that Plaintiff received the Procedural Safeguards Notice in 2017.  The transcript cite is unclear, as it came while Plaintiff was questioning Dr. Castaldo, and during her questioning, she

On April 13, 2018, Plaintiff filed an "Amended Due Process Complaint" (the "Amended DPC") with the State Education Department.  (D's Ex. 1.)  In that complaint, Plaintiff explained that she had taken L.F. out of Cherry Lane Elementary halfway through second grade because, among other things, he could not read.  (*See id.* at 2-3.)  Prior to removing L.F. from Cherry Lane Elementary, she had repeatedly asked the school and District for reading support for L.F., but she was denied or ignored.  (*Id.* at 3.)  When she placed L.F. at Our Lady, he learned how to read and write during his first year.  (*Id.*)  Plaintiff stated that she removed L.F. from parochial school because "his needs were no longer being appropriately met and he was not able to focus," and placed him at Barnstable, where he "continues to advance and thrive."  (*Id.* at 4.)[12]  In the Amended DPC, she sought reimbursement for two years at Barnstable, as well as "reimbursement for the previous four years," while L.F. was in parochial school, noting that she was "unable until recently [to] prove the district[']s failure in this matter and ultimately [its]

---

indicated that she had received a procedural safeguard list, but she did not state during what year or years she received it.  (Tr. at 148-49.)  The IHO interpreted this portion of the hearing to establish that Plaintiff had been provided with the Procedural Safeguards Notice during the 2012-13 school year.  (IHO Decision at 12 (citing Tr. at 148).)  Accordingly, Defendant's citations to the aforementioned portion of the Transcript and IHO Decision do not establish that Plaintiff received notice of her procedural rights in 2017, but rather may show that she received such notice in 2012-13.

A review of the record does not reveal any further evidence as to whether Plaintiff received the Procedural Safeguards Notice in 2017, and thus this might be an appropriate subject on which I could receive and review additional evidence.  *Eschenasy v. N.Y.C. Dep't of Educ.*, 604 F. Supp. 2d 639, 649 (S.D.N.Y. 2009) (district court may receive additional evidence that is relevant, noncumulative, and useful).  Ultimately, the issue of whether Plaintiff received a Procedural Safeguards Notice for the 2017-18 school year does not change the outcome here, but Defendant's statement in paragraph 43 of its 56.1 response on this subject is uncomfortably close to misleading.

[12] Plaintiff did not mention her placement of L.F. at St. Paul's in her Amended DPC.  Rather, she stated that she placed L.F. at Our Lady and that L.F. remained in "parochial school" through fourth grade, after which she placed him at Barnstable because his needs were no longer being met.  (D's Ex. 1 at 3-4.)

liability" and arguing that the statute of limitations should not run on her claims until "the date of discovery of the district's culpability and failure." (*Id.* at 4-5.)

On July 16 and July 25, 2018, the IHO conducted a hearing with Plaintiff and representatives of Defendant present. The IHO received evidence and took testimony from both parties. On September 10, 2018, the IHO issued her Findings of Fact and Decision. The IHO found that Plaintiff's claims for tuition reimbursement for the 2012-13, 2013-14, 2014-15, and 2015-16 school years were barred by the two-year statute of limitations applicable to such claims. (IHO Decision at 11-12.) The IHO also found that the District provided L.F. with a Free Appropriate Public Education ("FAPE") for the 2016-17 and 2017-18 school years because the TSC class, among other things, "was designed for students with average cognitive abilities and with behavioral issues, was highly structured, with class wide and individual management system to deal with behavior needs, and teaches academic and social emotional coping skills," all of which meet L.F.'s needs. (*Id.* at 16; *see id.* at 14-16.) The IHO also found the IEP for the 2017-18 school year to be procedurally proper. (*Id.* at 15.)

Because the IHO found that the District had provided L.F. with a FAPE, she did not need to address whether Plaintiff had carried her burden to show that Barnstable was an appropriate placement for L.F. But because Plaintiff was *pro se* in those proceedings (as she is here), the IHO addressed the issue. (*Id.* at 16.) The IHO concluded that Plaintiff had not met that burden, because she offered "no evidence regarding the program provided to [L.F.] at Barnstable." (*Id.*) Plaintiff did not provide information as to Barnstable's curriculum, whether classes were taught by special education teachers, what supports were in place for students with ADHD, how L.F.'s specific behavioral needs were addressed there, and what goals (if any) were being addressed there. (*Id.* at 17.) The evidence that Plaintiff did provide showed that the Barnstable class was

similar to the TSC class in that they both provide small classes that include some students with ADHD.  (*Id.*)  The IHO did not discuss whether the balance of equities favored tuition reimbursement for the 2016-2017 and 2017-18 school years.  (P's 56.1 Resp. ¶ 49.)  Plaintiff appealed the IHO's decision.

On November 23, 2018, the SRO affirmed the IHO's finding that Plaintiff's claims for the 2012-13, 2013-14, 2014-15, and 2015-16 school years were barred by the applicable statute of limitations.  (SRO Decision 11-13.)  The SRO addressed two possible exceptions to the two-year statute of limitations – the "specific misrepresentations" exception and the "withholding of information" exception – but found that neither applied.  (*Id.* at 12-13.)

The SRO also affirmed the IHO's finding that the District's IEP for the 2016-17 school year was "appropriate and the least restrictive setting to address [L.F.'s] needs related to academics and social/emotional/behavioral functioning," and thus "was reasonably calculated to enable the student to received educational benefit in light of his unique circumstances."  (*Id.* at 16.)  The SRO began his analysis of the District's 2016-17 IEP by explaining that the CSE reviewed L.F.'s "recent evaluative information," including "the results of a May 2016 social history completed by the parent, a May/June 2016 education re-evaluation report, and a May/June 2016 triennial psychological evaluation report."  (*Id.* at 14.)  Consistent with the substance of those reports, the CSE reported in the IEP that L.F.'s "cognitive skills were in the average range, he exhibited difficulty with reading, and was easily distracted, impulsive, and had a low frustration tolerance."  (*Id.* (citing D's Ex. 5 at 3-5).)  The SRO added that, based on the foregoing, the CSE determined that L.F. "would benefit from receiving services in a small, supportive therapeutic setting" and thus recommended the 12:1:1 TSC class.  (*Id.* at 15.)  The 12:1:1 TSC class was "'specifically designed for students who are cognitively intact but have

behavioral issues in the classroom,' including attention difficulties, distractibility, [and] organizational issues." (*Id.* (quoting Tr. at 68-69).)  Further, the SRO noted that the 12:1:1 TSC class provided predictability in the classroom, which would benefit L.F., as explained by both the director of the CSE and the school psychologist. (*Id.*)  The 2016-17 IEP also recommended L.F. undergo counseling. (*Id.* at 15-16.)  Based on all of the foregoing evidence, the SRO concluded that the 12:1:1 TSC class provided L.F. with a FAPE in the least restrictive setting. (*Id.* at 16.)

The SRO, however, was "not persuaded that the district's case is as strong for the 2017-18 IEP." (*Id.*)  Specifically, the SRO explained that "[t]he question left unanswered by the evidence in this case is, when considering information about [L.F.'s] progress over the 2016-17 school year at Barnstable, could the CSE have placed [L.F.] in a larger, less restrictive . . .setting, or otherwise . . . offered a placement with greater access to nondisabled peers than what was provided on the June 2017 IEP." (*Id.* at 18.)  Accordingly, the SRO stated he did not agree with the IHO's conclusion that the District provided L.F. with a FAPE for the 2017-18 school year. (*Id.*)

But despite finding that the District failed to provide L.F. with a FAPE for 2017-18, the SRO found that Plaintiff had failed to carry her burden to show that Barnstable was an appropriate placement.  The SRO noted that "Barnstable is an out-of-State private college preparatory school that provides students with 'individual attention, specialized learning programs, and [a] safe environment." (SRO Decision at 19 (alteration in original) (quoting what was Parent's Ex. F in that proceeding, and what is P's Decl. Ex. M at 9 here).)  Additionally, Barnstable is a "small" school "by design" and has an average class size of ten students. (Parent's Ex. F.)  Most classes are between eight and ten students and have one teacher. (Tr. at 425.)  Barnstable uses the Measure of Academic Progress ("MAP") test twice a year to

determine students' strengths and weaknesses, (Parent's Ex. B), and Plaintiff testified that she

believed that students were placed in classes based on their MAP test scores, (Tr. at 420).

The SRO also noted that Barnstable describes itself as providing "an ideal

environment . . . for students with mild learning differences such as ADHD, mild dyslexia, and

anxiety." (Parent's Ex. F.)  Additionally, Barnstable builds "[e]xecutive function skills" into its

curriculum.  (*Id.*)  According to Plaintiff, Barnstable offers an "[e]xecutive functioning

workshop," or "EFW," which is a class provided for "[e]veryone in [the] school" and focuses on

"executive functioning, skill building such as self monitoring, planning organization, emotional

control, initiation, shifting and working memory."  (Tr. at 423-25.)

While Plaintiff provided some evidence about Barnstable, the SRO found that Plaintiff

was "unclear which grades were considered middle school versus high school, how students

were grouped within classes, what grade level curriculum was provided in the student's class, or

how many students were in her son's class."  (SRO Decision at 20 (citations omitted).)[13]

Further, Plaintiff testified that Barnstable did not have a plan in place to address the fact that L.F.

received forty-seven and thirty-nine tardy designations during the 2016-17 and 2017-18 school

years, respectively.  (*Id.*)  The SRO added that, "[c]ritically, [Plaintiff] testified she did not know

if Barnstable provided any special education services," and on that record, the SRO could not

"conclude that [Plaintiff] established that Barnstable offers appropriate special education services

to address [L.F.'s] needs."  (*Id.*)

Finally, the SRO found that even if Plaintiff had carried her burden to show that

Barnstable was an appropriate placement, she was not entitled to tuition reimbursement due to

---

[13] Plaintiff submitted to this Court a letter addressed to the District's then-counsel and "CC[ed]" to the IHO stating that each of L.F.'s classes had between five and eight students.  (P's Decl. Ex. M at 1.)

equitable considerations.  (*Id.*)  Because Plaintiff failed to "follow[] the requirement to place the district on notice that she was removing the student from the district's school," the SRO stated that he would "decline to award [Plaintiff] tuition reimbursement for Barnstable for either the 2016-17 or 2017-18 school years."  (*Id.* at 21.)

### B.    **Procedural History**

On February 20, 2019, Plaintiff filed her Complaint here.  (Doc. 2.)  Defendant answered, (Doc. 9), and the Court held a case-management conference on September 5, 2019, (Minute Entry dated Sept. 5, 2019).  At the conference, the Court granted Plaintiff leave to amend her Complaint to clarify the SRO decisions from which she was appealing, and the Court also set a briefing schedule for Defendant's proposed summary judgment motion.  (*Id.*)

Following the conference, Plaintiff filed her Amended Complaint, claiming that, under the Individuals with Disabilities Education Act ("IDEA"), the SRO erred by finding that (1) her claims for tuition reimbursement for years before the 2016-2017 school year were time-barred, (2) the District provided L.F. with a FAPE for the 2016-2017 school year, (3) Plaintiff failed to demonstrate that Barnstable was an appropriate placement, and (4) equitable considerations did not support a tuition reimbursement.  (Doc. 13 ¶¶ 3-6, 8-13.)  Plaintiff also asked the Court to uphold the SRO's decision that the District did not provide L.F. with a FAPE for the 2017-18 school year.  (*Id.* ¶ 7.)

Defendant answered again and asserted a counterclaim, which had not been discussed at the case-management conference.  (Doc. 14.)  Defendant's counterclaim alleged that the SRO's finding that the Defendant did not provide L.F. with a FAPE for the 2017-18 academic year was not supported by a preponderance of the evidence and was incorrect as a matter of law.  (*Id.* ¶ 3.)  Plaintiff answered the counterclaim.  (Doc. 16.)

On November 14, 2019, Defendant filed the instant motion and supporting papers, including its memorandum of law.  (Doc. 19 ("D's Mem.").)  After requesting and receiving extensions, Plaintiff filed her opposition on January 30, 2020.  (Doc. 25 ("P's Opp.").)  Defendant filed a reply on March 12, 2020.  (Doc. 32.)

## II.    <u>LEGAL STANDARD</u>

Motions for summary judgment customarily resolve IDEA actions in federal court.  *See Antonaccio ex rel. Alex v. Bd. of Educ.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003).  Under the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion.  *Id.*  Rather, summary judgment "is a pragmatic procedural mechanism for reviewing administrative decisions."  *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (internal quotation marks omitted).  In reviewing an action pursuant to 20 U.S.C. § 1415(i), the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii); *see P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 406 (S.D.N.Y. 2017).

The court's review "requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete *de novo* review."  *L.O. ex rel. K.T. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 108 (2d Cir. 2016) (internal quotation marks omitted).  The district court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence, but its review of state administrative decisions is limited.  *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982); *M.H. ex rel. P.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012); *Walczak v. Fla. Union Free Sch.*

*Dist.*, 142 F.3d 119, 129 (2d Cir. 1998).  "While federal courts do not simply rubber stamp

administrative decisions, they are expected to give due weight to these proceedings, mindful that

the judiciary generally lacks the specialized knowledge and experience necessary to resolve

persistent and difficult questions of educational policy."  *Walczak*, 142 F.3d at 129 (alteration

and internal quotation marks omitted); *see M.H.*, 685 F.3d at 240.

        In many instances, "the district court's analysis will hinge on the kinds of considerations

that normally determine whether any particular judgment is persuasive, for example whether the

decision being reviewed is well-reasoned, and whether it was based on substantially greater

familiarity with the evidence and the witnesses than the reviewing court," but the determination

"must also be colored by an acute awareness of institutional competence and role."  *M.H.*, 685

F.3d at 244.  Deference to administrative decisions is particularly warranted where the district

court's review "is based entirely on the same evidence as that before the SRO," *id.*, and where

the IHO and SRO decisions are in agreement, *C.W. ex rel. W.W. v. City Sch. Dist. of N.Y.*, 171 F.

Supp. 3d 126, 131-32 (S.D.N.Y. 2016).  Where the IHO and SRO decisions conflict, the IHO's

"may be afforded diminished weight," as the Court "defer[s] to the final decision of the state

authorities" – that is, the SRO's decision.  *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171

(2d Cir. 2009) (internal quotation marks omitted).  Reviewing courts should also be mindful that

they are not to "substitute their own notions of sound educational policy for those of the school

authorities which they review."  *Rowley*, 458 U.S. at 206.  Accordingly, "a court must defer to

the SRO's decision on matters requiring educational expertise unless it concludes that the

decision was inadequately reasoned," *R.E. ex rel. J.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167,

189 (2d Cir. 2012), particularly with respect to "determinations regarding the substantive

adequacy of an IEP," *M.H.*, 685 F.3d at 244.  In short, deference to "the application of expertise

and the exercise of judgment by school authorities" is appropriate where they "offer a cogent and responsive explanation for their decisions." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001-02 (2017).

## III.   DISCUSSION

As an initial matter, Plaintiff requests that this Court consider additional evidence outside of the record before the IHO and SRO.  (P's Opp. at 2-3; *see* P's 56.1 Resp.; P's Decl. Exs.) Defendant submitted an attorney affidavit explaining why that request should be rejected, (Doc. 30), and Defendant's entire reply is dedicated to the same topic, (Doc. 32).  But I need not reach the issue of whether I can consider the additional evidence, because even if I did consider it, the result of the case would be unchanged.

### A.   Statute of Limitations

Under the IDEA, "[a] parent . . . shall request an impartial due process hearing within 2 years of the date the parent . . . knew or should have known about the alleged action that forms the basis of the complaint."  20 U.S.C. § 1415(f)(3)(C).  The two-year period is typically triggered when a parent receives the IEP that the parent finds unsatisfactory or understands from a CSE meeting that recommendations that the parent finds unsatisfactory will be made.  *See F.L. v. Bd. of Educ. of the Great Neck U.F.S.D.*, 274 F. Supp. 3d 94, 113-14 (E.D.N.Y. 2017), *aff'd*, 735 F. App'x 38 (2d Cir. 2018) (summary order).  Parents plainly know about the alleged action when they request services that are denied, unilaterally withdraw the child from the public school, or observe progress in a private placement.  *See K.C. v. Chappaqua Cent. Sch. Dist.*, No. 16-CV-3138, 2018 WL 4757965, at *14 (S.D.N.Y. Sept. 30, 2018).

The two-year statute of limitations "shall not apply," however, "if the parent was prevented from requesting the hearing due to" either "(i) specific misrepresentations by the local

educational agency that it had resolved the problem forming the basis of the complaint;" or "(ii) the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent."  20 U.S.C. § 1415(f)(3)(D).

"As the statute of limitations presents a question of law, the court may make that determination without deferring to the administrative decisionmaker's conclusions." *F.L.*, 274 F. Supp. 3d at 113 (E.D.N.Y. 2017) (internal quotation marks omitted).

Plaintiff filed her Amended DPC on April 13, 2018, meaning that any claim that accrued before April 13, 2016, is untimely.[14]  Defendant argues that, as both the IHO and SRO held, Plaintiff's claims regarding the 2011-12 through 2015-16 school years are all barred by the IDEA's two-year statute of limitations, as the IEPs for those years were developed before April 13, 2016, and neither of the enumerated exceptions to the statute of limitations apply.  (D's Mem. at 3.)  Plaintiff argues that Defendant "purposely misrepresented" L.F.'s progress and behavior, "in an attempt to violate IDEA requirements," and thus the statute of limitations should be tolled.  (P's Opp. at 7.)  In other words, Plaintiff does not dispute that her claims accrued beyond the two-year statute of limitations, but rather she argues that "because the district misrepresented the fact that there was a problem by saying that L.F.'s reading was adequate and later misrepresented the cause of the problem, saying it was behavioral," she was "prevented . . . from understanding that she had a basis to challenge within the 2-year limitations period the

---

[14] Typically a court uses the date of the original DPC, not the Amended DPC, as a starting point to calculate the statute of limitations, *see K.C.*, 2018 WL 4757965, at *15 (in evaluating which claims are time-barred, using the date of plaintiff's original DPC, not the amended DPC), but here, Plaintiff's original DPC was brought only in relation to the 2017-18 school year, (*see* D's Ex. 18 at 3; P's Decl. Ex. Q at 3).  Accordingly, the statute of limitations on Plaintiff's claims regarding school years prior to 2017-18 continued to run until Plaintiff filed her Amended DPC.

district's decision refusing to provide L.F. with additional reading support." (*Id.* at 10.) Despite Plaintiff's valiant effort, I reject this argument.

For the "specific misrepresentation" exception to the IDEA's statute of limitations to apply, Defendant must have represented that "it had resolved the problem forming the basis of the complaint." 20 U.S.C. § 1415(f)(3)(D)(i); *see Bd. of Educ. of N. Rockland Cent. Sch. Dist. v. C.M. ex rel. P.G.*, 744 F. App'x 7, 11 (2d Cir. 2018) (summary order). But here, Plaintiff's assertions show that the District never represented that it had solved the problem. To the contrary, Plaintiff's version of events depicts a District that was unresponsive to or dismissive of her concerns regarding L.F.'s lack of progress, and later proposed a solution that was unsatisfactory to her.

Plaintiff states that during the 2011-12 school year, L.F.'s teachers and the school administrator told Plaintiff that L.F. was progressing in reading, but Plaintiff's observations of L.F. at home suggested the opposite. (P's Opp. at 7.) Plaintiff thus repeatedly requested that L.F. be provided with extra reading instruction, but the District told Plaintiff that L.F. did not require any additional support because he was receiving additional reading instruction in his class. (*Id.* at 7-8.) But, according to Plaintiff, the District eventually agreed that L.F.'s needs would be better met in a self-contained classroom. (*Id.* at 8.) Plaintiff, however, rejected this recommendation. (*Id.*) At the end of the 2011-12 school year, Defendant called an IEP meeting at which faculty and CSE members represented that Plaintiff "was not progressing satisfactorily." (*Id.*) That is a far cry from saying that it had solved the problem.

Three months later, at the beginning of the 2012-13 school year, Plaintiff discovered that L.F. did not know the alphabet or how to read, and from September 2012 through December 2012, Plaintiff states that the District denied or ignored Plaintiff's "requests for additional

reading support." (*Id.* at 9.)  Once again, these are not representations that the District had

solved the problem.  Plaintiff removed L.F. from the public school in December 2012.

      Thus, from the outset, Plaintiff disagreed with the District's plans and offered her own

plans, which the District rejected and which prompted a private placement.  On these facts,

where Plaintiff never changed her mind on L.F.'s needs based on the District's representations,

Plaintiff's invocation of the specific misrepresentation exception is unpersuasive.  *C.M. ex rel.*

*P.G.*, 744 F. App'x at 11.[15]  Accordingly, no exception to the two-year statute of limitations

applies, and any claim based on events that occurred prior to April 13, 2016, is outside the statute

of limitations.

      In sum, Plaintiff's claims stemming from the District's IEPs developed for L.F. for the

2011-12 through 2015-16 school years are time-barred.  Defendant is thus entitled to summary

judgment on Plaintiff's claim that the SRO erred in so finding.

### B.    FAPE for the 2016-17 School Year

      "The IDEA requires States receiving federal funds to provide 'all children with

disabilities' with a FAPE," which includes "'special education and related services' tailored to

meet the unique needs of a particular child."  *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735,

---

[15] In Plaintiff's opposition she does not explicitly invoke the "withholding of information" exception to the IDEA's two-year statute of limitations, but even if she had, any such argument would be rejected.  Under the withholding of information exception, "the IDEA's two-year statute of limitations must be tolled if a parent did not know of her rights because of a school district's failure to provide procedural safeguard notices."  *Bd. of Educ. of N. Rockland Cent. Sch. Dist. v. C.M.*, No. 16-CV-3924, 2017 WL 2656253, at *9 (S.D.N.Y. June 20, 2017), *aff'd sub nom. C.M. ex rel. P.G.*, 744 F. App'x 7.  Here, Plaintiff disputes only whether she received the Procedural Safeguards Notice in 2017.  (P's 56.1 Resp. ¶ 43; *see* P's Decl. ¶ 36.)  Accordingly, the statute of limitations for the IEPs the District issued for the 2011-12 through 2015-16 school years cannot be tolled under the withholding of information exception.

741 (2d Cir.) (first quoting 20 U.S.C. § 1412(a)(1)(A); then quoting *id.* § 1401(9)), *cert. denied*, 139 S. Ct. 322 (2018).

"The IEP is 'the centerpiece of the [IDEA's] education delivery system for disabled children.'" *Id.* (quoting *Endrew F.*, 137 S. Ct. at 994).  The IEP must be developed annually by "[a] school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child." *Walczak*, 142 F.3d at 122.  "A school district meets its obligations to provide a FAPE by creating an IEP that is developed in compliance with the IDEA's procedural and substantive requirements." *N.B. v. N.Y.C. Dep't of Educ.*, 711 F. App'x 29, 32 (2d Cir. 2017) (summary order).  In the Second Circuit, review of the adequacy of an IEP proceeds in two steps:  (1) whether "the District has complied with the IDEA's procedural requirements" and (2) whether, substantively, the IEP is "'reasonably calculated to enable the child to make progress appropriate in light of the child's circumstances.'" *Mr. P*, 885 F.3d at 748 (alteration omitted) (quoting *Endrew F.*, 137 S. Ct. at 999).  "As to this latter requirement, the IEP need not bring the child to grade-level achievement, but it must aspire to provide more than *de minimis* educational progress." *N.B.*, 711 F. App'x at 32.  "What the statute guarantees is an appropriate education, not one that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (internal quotation marks omitted).

"In addition to providing an education that is likely to produce progress and tailored to the unique needs of the child, the program must be offered in the least restrictive environment." *Avaras ex rel. A.A. v. Clarkstown Cent. Sch. Dist.*, No. 18-CV-6964, 2019 WL 4600870, at *2 (S.D.N.Y. Sept. 21, 2019) (citing 20 U.S.C. § 1412(a)(5)(A)).  "[A] disabled student's least restrictive environment refers to the least restrictive educational setting consistent with that student's needs, not the least restrictive setting that the school district chooses to make

available." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 163 (2d Cir. 2014).

"This requirement expresses a strong preference for children with disabilities to be educated, to

the maximum extent appropriate, together with their non-disabled peers." *Id.* (internal quotation

marks omitted).

"If a state receiving IDEA funding fails to give a disabled child a FAPE . . . , the child's

parent may remove the child to an appropriate private school and then seek retroactive tuition

reimbursement from the state." *Bd. of Educ. v. O'Shea*, 353 F. Supp. 2d 449, 454 (S.D.N.Y.

2005) (internal quotation marks omitted).  Parents who seek such reimbursement must satisfy the

three-pronged "*Burlington/Carter*" test, which looks to (1) whether the school district's proposed

program will provide a FAPE; (2) whether the parents' private placement is appropriate; and

(3) a consideration of the equities.  *See generally Florence Cty. Sch. Dist. Four v. Carter*, 510

U.S. 7 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985).  To satisfy the

first prong, the school district bears the burden of proving that it timely provided a FAPE to the

student.  N.Y. Educ. Law § 4404(1)(c); *see T.K. ex rel. L.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d

869, 875 (2d Cir. 2016) ("Under New York law, the Department [of Education] bears the burden

of establishing the validity of the IEP.").  To satisfy the second prong, the parent bears the

burden of demonstrating that the unilateral private placement was appropriate.  *See, e.g.*,

*Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007).  Whether a parental

placement is appropriate turns on "whether a placement – public or private – is reasonably

calculated to enable the child to receive educational benefits." *Frank G. v. Bd. of Educ. of Hyde

Park*, 459 F.3d 356, 364 (2d Cir. 2006) (internal quotation marks omitted).  The parent "need not

show that a private placement provides every special service necessary to maximize the[] child's

potential," but must "demonstrate that the placement provides educational instruction specially

designed to meet the unique needs of a handicapped child. " *Id.* at 365 (internal quotation marks omitted). Even where there is evidence of academic progress at a private placement, "courts should not disturb a state's denial of IDEA reimbursement where . . . the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by the parents of any child, disabled or not." *Gagliardo*, 489 F.3d at 115.

### 1.   Whether the District Provided L.F. with a FAPE for the 2016-17 School Year[16]

Defendant's brief is surprisingly devoid of any discussion on the merits of whether its IEP for the 2016-17 school year actually provided L.F. with a FAPE. Instead, Defendant argues at length as to why the SRO's decision should be given great deference, which, while true, is just the starting point of the analysis. As Defendant explained in its brief, I must analyze "whether the IEPs at issue were reasonably calculated to enable L.F. to receive educational benefits," (D's Mem. at 5 (citing *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982)), yet other than saying that I should defer to the SRO's findings to that end, Defendant does not provide any explanation as to why the IEP was substantively appropriate. Stating that I should "review the administrative record below as well as the decision rendered by the SRO (and, if necessary, by the IHO) and determine whether their conclusions were correct based upon the preponderance of the evidence developed in that record," (*id.* at 7) – but then providing no discussion of what those decisions were, on what evidence they relied, and why those decisions were correct – is unhelpful. Similarly, stating that "the District's highly trained and experienced educators testified to the 2016-2017 IEP being specifically designed to provide

---

[16] The SRO could not conclude whether the District's IEP for L.F.'s 2017-18 school year provided him with a FAPE. While Defendant's counterclaim stems from this part of the SRO's decision, Defendant is not challenging that conclusion on this motion. (D's Mem. at 6.)

him the educational programs and support he needed in the least restrictive environment that would meet his unique needs," (*id.*), and then not providing even a single citation to that testimony or any analysis as to why the IEP was specifically designed to provide L.F. with a FAPE under the least restrictive environment, leaves this Court to do the job of the District's lawyers.

Plaintiff too did not address in her opposition whether L.F. was provided with a FAPE for the 2016-17 school year, although Plaintiff's failure is far more excusable considering that she is a *pro se* Plaintiff and Defendant barely argued the issue.

In any event, for the reasons discussed below, I find by a preponderance of the evidence, *see* 20 U.S.C. § 1415(i)(2)(C)(iii), that the SRO did not err in finding that the District provided L.F. with a FAPE for the 2016-17 school year.  The SRO's analysis deserves deference from this Court, *see M.H.*, 685 F.3d at 244 ("[T]he district court should afford more deference [to the SRO's decision] when its review is based entirely on the same evidence as that before the SRO . . . ."), especially given that the SRO and IHO agreed on this issue, *C.W. ex rel. W.W.*, 171 F. Supp. 3d at 131.

As noted, the SRO found that the IEP the District developed for L.F. for the 2016-17 school year was procedurally and substantively sound.  Specifically, relying on the findings of the CSE, which were consistent with the substance of multiple evaluations of L.F., the SRO found that L.F.'s "cognitive skills were in the average range, he exhibited difficulty with reading, and was easily distracted, impulsive, and had a low frustration tolerance."  (SRO Decision at 14 (citing D's Ex. 5 at 3-5).)  The SRO confirmed that the CSE's determination that L.F. "would benefit from receiving services in a small, supportive therapeutic setting" was supported by the evidence in the record.  (*Id.* at 15.)  Further, the SRO concluded that the 12:1:1 TSC class was

"'specifically designed for students who are cognitively intact but have behavioral issues in the classroom,' including attention difficulties, distractibility, [and] organizational issues," and provided predictability in the classroom, from which L.F. would benefit.  (*Id.* (quoting Tr. at 66-69).)

The evidence before the SRO and before this Court now suggests that the 12:1:1 TSC class would have met Plaintiff's needs.  *See Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 380 (S.D.N.Y. 2006) ("no reason why this Court should second-guess the expertise of trained educators . . . where the SRO found the CSE also relied upon a mass of objective testing data").  And Plaintiff has not offered any explanation as to why the 12:1:1 TSC class would not have done so.  Instead, she suggests that Barnstable's program better meets L.F.'s needs.  But while Plaintiff was dissatisfied with the placement, the law does not require the District to place L.F. in the best possible environment; it merely requires the District to make a recommendation that is reasonably calculated to enable L.F. to make progress appropriate in light of his circumstances in the least restrictive environment.  *See Endrew F.*, 137 S. Ct. at 999.  In other words, the issue is not whether Barnstable could meet L.F.'s needs better than the 12:1:1 TSC class at Montebello, but rather is whether there are adequate grounds for me to overrule the SRO's judgment that the District's IEPs recommending the latter program offered L.F. a FAPE.  Plaintiff has not identified any evidence suggesting that there are such grounds, and finding none myself, I find that the SRO did not err in concluding that the District provided a FAPE for L.F. for the 2016-17 school year.

      **2.**      **Whether Plaintiff's Placement of L.F. at Barnstable Was Appropriate**

In addition to considering whether the District's IEPs for L.F. provided him with a FAPE, the SRO considered whether Plaintiff had established that her unilateral placement at Barnstable

was appropriate.  (SRO Decision at 18-20.)  The SRO began by correctly explaining, as already

noted, that "'the issue turns on' whether a placement is 'reasonably calculated to enable the child

to receive educational benefits.'"  (*Id.* at 18-19 (quoting *Frank G.*, 459 F.3d at 364).)

> No one factor is necessarily dispositive in determining whether parents' unilateral
> placement is reasonably calculated to enable the child to receive educational
> benefits.  Grades, test scores, and regular advancement may constitute evidence that
> a child is receiving educational benefit, but courts assessing the propriety of a
> unilateral placement consider the totality of the circumstances in determining
> whether that placement reasonably serves a child's individual needs.

*Gagliardo*, 489 F.3d at 112 (internal quotation marks omitted).  As noted, Plaintiff carries the

burden to establish that her unilateral placement was appropriate.  *See id.*

　　　As discussed by the SRO, Plaintiff failed to present evidence regarding critical issues that

was needed to determine whether Barnstable was an appropriate placement.  Plaintiff did not

know whether Barnstable provided any special education services, and she testified that

Barnstable had no plan to address the substantial number of tardy designations L.F. accrued over

his two years at Barnstable.  (SRO Decision at 20.)  Additionally, Plaintiff was "unclear . . . how

students were grouped within classes" and "what grade level curriculum was provided in the

student's class."  (*Id.* (citations omitted).)[17]

　　　Considering the evidence Plaintiff put forward at the hearing and before this Court, as

well as the evidence she did not provide, I find that Plaintiff has established that Barnstable

---

[17] The SRO also stated that Plaintiff did not know how many students were in L.F.'s
class, but in her submissions to this Court, she includes a letter she sent to the District's then-
counsel and the IHO stating that L.F.'s classes each had between five and eight students.  (P's
Decl. Ex. M at 1.)  This is inconsistent with her testimony at the hearing that class size varied
between eight and ten students, (Tr. at 425-27), but in any event, even if L.F. had five to eight
peers in his class, it would not change the outcome here.  As the CSE explained in the IEP and as
the SRO discussed, small class size is just one of the benefits offered by the 12:1:1 TSC, (*see* D's
Ex. 6 at 2; SRO Decision at 15), and establishing that Barnstable offered small class sizes does
not alone show that it was an appropriate placement for L.F.

would be a good school for any student – classes were small, students get "individualized attention" in a "safe environment," and all students take an executive function skills class – but Plaintiff did not offer evidence establishing that the school was a proper placement for L.F. in particular.  In other words, Plaintiff's evidence is insufficient to establish that Barnstable met L.F.'s "unique needs."  *Gagliardo*, 489 F.3d at 115; *see Stevens ex rel. E.L. v. N.Y.C. Dep't of Educ.*, No. 09-CV-5327, 2010 WL 1005165, at *9 (S.D.N.Y. Mar. 18, 2010) (affirming SRO's decision that a unilateral placement was not appropriate where record lacked evidence that the program "provide[d] a curriculum or individual goals for the Student," or "any of the specialized services, such as occupational or speech therapy, that the Student had previously needed and received," and where there was "no detailed information about how the Student's deficits impacted his ability to function effectively in the classroom" nor "any information on what strategies or exercises [the private school] implemented to address the Student's deficits").

Plaintiff argues that she established that Barnstable provided "special education services" by showing that it has "an average class size of 10 students, some of whom had mild learning differences"; "that the teachers provided individualized attention, and used a variety of teaching methods suited to each student's individual strengths and weaknesses, as well as different types of learners"; and "that the school provided an executive functioning class that addressed difficult areas related to students' learning differences."  (P's Opp. at 4.)  But this conclusory argument is simply not supported by the cited evidence.  That Barnstable advertises itself as meeting students' individualized needs in small classes does not mean that it offers special education services.  To the contrary, every student in the school is offered these same services – whether they have special needs or not – and none of them appear to be administered by special education professionals.  Further, even if these did constitute special education services, there is no

evidence that the services offered are designed to meet L.F.'s unique needs. *See Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 452 (2d Cir. 2015) (evidence private school offered small classes and modified grading procedures did not show it "provide[d] the special education services specifically needed by" student) (internal quotation marks omitted). And "where, as here, the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not," evidence of those benefits is insufficient to establish that a unilateral placement was appropriate. *Gagliardo*, 489 F.3d at 115. This is the case "even where there is evidence of success," *id.*, so Plaintiff's argument that L.F. was making "excellent progress" at Barnstable, (P's Opp. at 4), does not provide sufficient grounds for the Court to "disturb a state's denial of IDEA reimbursement," *Gagliardo*, 489 F.3d at 115.

Plaintiff also argues that the SRO erred by faulting Plaintiff for (1) failing to establish which grades constituted middle school and which constituted high school at Barnstable, because the term "middle school" is an arbitrary classification that varies from school to school; and (2) being unaware of what grade-level curriculum was taught in Plaintiff's classes, as that information was listed on L.F.'s report card, which was entered into evidence. (P's Opp. at 4.) Starting with Plaintiff's first two arguments, I am reluctant to disregard the SRO's findings as irrelevant, because the SRO is more knowledgeable than I about what issues make a school more or less appropriate for a student with L.F.'s specific needs. *See R.E. ex rel. J.E.*, 694 F.3d at 189 ("a court must defer to the SRO's decision on matters requiring educational expertise"). But even if Plaintiff is correct that the SRO should not have considered Barnstable's distinction between middle and high school or whether Plaintiff knew what grade-level curriculum was taught in L.F.'s classes, it would not change my decision here. I find that Plaintiff's inability to

speak to Barnstable's special education program and more specifically, Barnstable's plans to address L.F.'s unique needs, is why Plaintiff failed to carry her burden of showing that Barnstable was an appropriate placement.  Thus, even if Barnstable had proper middle school and high school designations, and even if it provided the appropriate grade-level curriculum in L.F.'s classes, I still would not have enough evidence to overturn the SRO's decision that Plaintiff had not shown Barnstable to be an appropriate unilateral placement.

Plaintiff also argues that the SRO should not have considered whether Barnstable had a plan in place to deal with L.F.'s substantial tardy designations, because the tardy designations decreased over time.  (P's Opp. at 4.)  But I reject this argument as well.  Plaintiff has failed to show that Barnstable had any plans in place to deal with L.F.'s unique situation, including his repeated tardy designations, and merely stating that the designations decreased from forty-seven to thirty-nine, which both appear to me to be quite high numbers, shows that Plaintiff failed to carry her burden to show that Barnstable offered services "specially designed to meet the unique needs" of L.F.  *Gagliardo*, 489 F.3d at 112 (internal quotation marks omitted).

Finally, part of Plaintiff's opposition seems to acknowledge that the evidence she presented to the IHO and SRO was insufficient to establish that Barnstable was an appropriate placement, and instead she argues that she was prevented from submitting evidence to that end. "For example," Plaintiff argues, she "was not allowed to admit into evidence the student's schedule, which had all academic classes in the morning, and made the program appropriate for L.F. because it allowed him to have his most difficult classes at the time when he was best able to focus."  (P's Opp. at 3.)  But this argument is rejected for three reasons.  First, Plaintiff entered into evidence L.F.'s 2016-16 and 2017-18 report cards from Barnstable, which listed the classes that L.F. took and the order in which he took those classes, admitted as Parent's Exhibit C at the

hearing.  Thus, the SRO was aware of L.F.'s schedule, which shows that in 2016-17 he had had science and reading classes in the first and second periods and ended the day with science lab, art, and social skills, and in 2017-18 he had math and reading classes as his first and second periods and ended the day with music, French, and art classes.  Second, and more critically, even now, Plaintiff argues that at Barnstable, "*students* have more demanding academic classes in the morning and before lunch and less academically demanding classes such as arts, language, music, and physical education after lunch and until the end of the school day."  (P's Decl. ¶ 17 (emphasis added).)  Thus, once again, Plaintiff is presenting evidence that establishes that all students, not L.F. in particular, would benefit from Barnstable's pedagogical methods.  But there is no evidence that Barnstable tailored L.F.'s schedule to meet his needs nor created that schedule to help support students who have L.F.'s particular learning differences.  Third, the IHO apparently explained to Plaintiff before the hearing began that the best practice is to have someone from the private school testify regarding its program and reminded Plaintiff that the burden was on her to show that the private placement was appropriate.  (IHO Decision at 17.) Plaintiff was thus not only not prevented from offering evidence, but she was encouraged to do so.

Plaintiff also argues that she was not permitted to submit evidence that L.F. received extra classes in reading.  (P's Opp. at 3.)  But the paragraph in her declaration to which she cites to support this argument, (P's Decl. ¶ 17), says nothing of whether L.F. took additional reading classes at Barnstable, let alone that she was prevented from admitting evidence of the same. Indeed, I can find no evidence in the record before me, including a review of L.F.'s report card and schedule, (Parent's Ex. C; P's Decl. Ex. M at 5-6, 8), suggesting that L.F. took extra reading classes.  Plaintiff's argument to this end is thus rejected.

Accordingly, I affirm the SRO's decision that Plaintiff has failed to carry her burden of showing that Barnstable was an appropriate placement, and thus on this additional ground she is not entitled to reimbursement for the 2016-17 school year.

### C.      FAPE for the 2017-18 School Year

The same failure to show that Barnstable was an appropriate placement also precludes reimbursement for the 2017-18 school year, assuming for the sake of argument that the SRO's decision that the District had failed to show it provided a FAPE for that year is correct. Defendant has asserted a counterclaim attacking that conclusion, but neither side has moved for summary judgment on that counterclaim.  Although it appears to the Court that the counterclaim is moot, Defendant shall advise the Court by July 28, 2020, as to whether it wishes to pursue or voluntarily dismiss it.[18]

## IV.      CONCLUSION

For the foregoing reasons, Defendant's motion is GRANTED.  Defendant is entitled to summary judgment on Plaintiff's first three claims, and her fourth claim is dismissed as moot. The Clerk of Court is respectfully directed to terminate the pending motion.  (Doc. 17.)

**SO ORDERED.**

Dated: July 21, 2020
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[18] Because I find that the District provided L.F. with a FAPE for the 2016-17 year, and because I find that Plaintiff failed to carry her burden to show that Barnstable was an appropriate unilateral placement for both the 2016-17 and 2017-18 school years, I need not reach the issue of "whether equitable considerations affect relief," *T.P. ex rel S.P.*, 554 F.3d at 254, and I dismiss as moot Plaintiff's claim regarding the SRO's findings on equitable considerations.